## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARL JOHNSON,

                  *Petitioner,*

   v.

KEVIN RANSOM, et al.,

                  *Respondents.*

CIVIL ACTION
NO. 19-2694

**PAPPERT, J.**                                          **June 16, 2021**

## <u>MEMORANDUM</u>

Carl Johnson seeks a writ of habeas corpus under 28 U.S.C. § 2254. Magistrate Judge Thomas J. Reuter issued a Report and Recommendation recommending denial of Johnson's petition. Johnson filed objections to the R&R. The Court overrules the objections, adopts the R&R and denies the petition.

I

Johnson was convicted of first-degree murder and conspiracy to commit murder following a jury trial in the Philadelphia County Court of Common Pleas. *See Commonwealth v. Johnson*, No. CP-51-CR-011742-2009 (Pa. Ct. Com. Pl. Phila. Cnty. May 30, 2012) (hereinafter "Trial Ct. Op."). He was sentenced to life without the possibility of parole for the murder and a concurrent twenty to forty-year sentence on the conspiracy charge. *See Commonwealth v. Johnson*, No. 347 EDA 2012, 2013 WL 11274675, at *1 (Pa. Super. Ct. Mar. 12, 2013.)

A

Johnson was convicted for the shooting death of Tyleigh "Sy" Perkins. Perkins

was shot four times around 1:00 a.m. on September 14, 2008 while sitting on the front steps of a house with his friend Tyrone Edgefield.  *See id*.  The shots "penetrated Perkins' intestine, severed his aorta and lodged in his spine . . . ."  *Id*.  He was pronounced dead at Temple University Hospital at 6:30 that morning.  *Id*.  Edgefield was not wounded and was the only witness to the shooting who testified at trial.

Several days before the shooting, Shawn Jacobs (Johnson's brother, who was a minor) and Devon Edwards had gotten into a fight.  (Notes of Testimony (N.T.) 11/9/2011 (Trial) at 24-25, 29.)  Perkins intervened in the argument and picked up Jacobs' cell phone which had fallen to the ground, giving it to a neighbor to return to Jacobs later.  (*Id*. at 24-28.)  As Jacobs walked away, he threatened Perkins.  According to one witness, Jacobs told Perkins, "you better have your vest on.  I ain't playing you. You better make sure you have your vest on."  (*Id*. at 26.)  After the fight, Johnson drove around the neighborhood looking for Perkins and eventually took Jacobs' cell phone back from the neighbor.  (*See* Trial Ct. Op. at 1-2.)  On the night of the shooting, Johnson drove in front of the house where Perkins sat, lowered the driver's side window and leaned back in his seat.  Another person leaned across from the passenger's seat and shot Perkins.  (*Id*.)

B

Johnson appealed his conviction, contending erroneous evidentiary rulings deprived him of a fair trial.  The rulings included:  (1) the admission of inadmissible hearsay; (2) the "admission of uncharged conduct of a third party without linkage to" him; and (3) the admission of evidence that "conveyed guilt by association," i.e., his brother's refusal to speak with police after consulting with counsel.  *Commonwealth v.*

*Johnson*, No. 347 EDA 2012, 2013 WL 11274675, at *1 (Pa. Super. Ct. Mar. 12, 2013); *see also Commonwealth v. Johnson*, 69 A.3d 1288 (Pa. Super. Ct. 2013) (Table).  The Superior Court affirmed the judgment of sentence, 2013 WL 11274675, at *1, and the Pennsylvania Supreme Court denied his request for allowance of appeal. *Commonwealth v. Johnson*, 74 A.3d 125 (Pa. 2013) (Table).

He filed a timely *pro se* Pennsylvania Post Conviction Relief Act petition.  *See Commonwealth v. Johnson*, CP-51-CR-00011742-2009 (Pa. Comm. Pl. Phila. Cnty. Jan. 2, 2014).  After he was appointed appellate counsel, Johnson retained private counsel and amended his PCRA petition.  *Commonwealth v. Johnson*, CP-51-CR-00011742-2009 (Pa. Comm. Pl. Phila. Cnty. Apr. 7, 2017) (*see also* Resp't Br., Ex. B., ECF 18-1 at ECF p. 15-33).  Johnson claimed his trial counsel had been ineffective for not presenting an alibi witness and sought an evidentiary hearing on that issue.  (*Id.* at ECF p. 26-30.) The PCRA court filed a notice of its intention to dismiss his petition under Pennsylvania Rule of Criminal Procedure 907 and then did so without a hearing.  *See Commonwealth v. Johnson*, CP-51-CR-00011742-2009 (Pa. Comm. Pl. Phila. Cnty. Apr. 6, 2018) (*see also* Resp't Br., Ex. C., ECF 18-1 at ECF p. 35).

After the PCRA court issued its opinion (Resp't Br., Ex. C., ECF 18-1 at ECF p. 35-44), Johnson appealed to the Superior Court, which agreed his PCRA claims did not merit relief.  *Commonwealth v. Johnson*, 2018 WL 6629183, No. 4043 EDA 2017 (Pa. Super. Ct. Dec. 19, 2018); *see also Commonwealth v. Johnson*, 203 A.3d 330 (Pa. Super. Ct. 2018) (Table).  Johnson did not file a petition for allowance of appeal with the Pennsylvania Supreme Court; he instead filed a counseled habeas petition in this Court.  (Pet'n ECF 1.)   Johnson raises six objections to Judge Reuter's R&R.  (Pet'r

Obj., ECF 15; *see also* R&R, ECF 13.)

## II

The Court reviews de novo the specific portions of the R&R to which Johnson objects and "may accept, reject, or modify" Judge Reuter's conclusions "in whole or in part." 28 U.S.C. § 636(b)(1)(c); *see also* Fed. R. Civ. P. 72(b)(3).

### A

28 U.S.C. § 2254 permits the Court to grant habeas relief only if (1) the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). To determine whether a state court's application of federal law is "'unreasonable,'" the Court must apply an objective standard, such that the relevant application "may be incorrect but still not unreasonable." *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (quoting *Williams*, 529 U.S. at 409-10). The test is whether the state court decision "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo v. Superintendent. SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999) (en banc). This

standard "is difficult to meet:" the petitioner must show "the challenged state-court ruling rested on an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013) (citation and internal quotation omitted).

"'Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.'" *Dellavecchia v. Sec'y Pa. Dep't of Corrs.*, 819 F.3d 682, 692 (3d Cir. 2016) (alteration in original) (quoting *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000)). State court factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams*, 529 U.S. at 411). Rather, § 2254(d)(2) requires "substantial deference" to the state trial court. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341-342 (2006) (alteration in original)). However, "'[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,'" and "'does not by definition preclude relief.'" *Brumfield*, 576 U.S. at 314 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

B

Habeas petitioners must exhaust state remedies before seeking relief in federal court. *See* 28 U.S.C. § 2254(b)(1)(A). Exhaustion ensures state courts have the first opportunity to review federal constitutional challenges to state convictions. *See Davila*

*v. Davis*, 137 S. Ct. 2058, 2064, 198 L. Ed. 2d 603 (2017) ("The exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first according the state courts an opportunity to correct a constitutional violation.") (citation, internal quotations and alteration omitted).  For the same reason, ordinarily "a federal court may not review federal claims that were procedurally defaulted in state court – that is, claims that the state court denied based on an adequate and independent state procedural rule."  *Id.* at 2064.

The prohibition on reviewing procedurally defaulted claims may be excused if the petitioner can show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Id.* at 2065 (citation and internal quotation omitted).  "Attorney error" may be "an objective external factor providing cause for excusing a procedural default" if it "amounted to a deprivation of the constitutional right to counsel."  *Id.* (citation omitted).  Under the "narrow exception" established in *Martinez v. Ryan*, a federal habeas petitioner may raise an otherwise defaulted ineffective assistance of trial counsel claim if in their state post-conviction proceeding, they had "no counsel or counsel in that proceeding was ineffective."  566 U.S. 1, 17 (2012).

To qualify for *Martinez's* exception, a petitioner must show his ineffective assistance of trial counsel claim has "some merit," i.e., "that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Workman v. Sup't Albion SCI*, 915 F.3d 928, 938 (3d Cir. 2019).  This "is a threshold inquiry that does not require full consideration of

the factual or legal bases adduced in support of the claims." *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 238 (3d Cir. 2017) (citation and internal quotation omitted). The petitioner must also show his state post-conviction counsel was ineffective for failing to present or properly preserve the issue, i.e., that his PCRA "counsel's errors were so serious as to deprive [him] of a fair trial." *Id.* The Court may choose which element to consider first. *See Bey*, 856 F.3d at 237-38. The failure to establish either precludes application of *Martinez's* exception. *Id.*

C

Ineffective assistance claims are governed by *Strickland v. Washington's* two-part test. 466 U.S. 668, 669 (1984). To succeed. Johnson must show (1) "counsel's performance was deficient, in that it fell below an objective standard of reasonableness", and (2) he "suffered prejudice as a result of the deficiency." *Blystone v. Horn*, 664 F.3d 397, 418 (3d Cir. 2011) (citing *Strickland*, 466 U.S. at 687). His claim cannot proceed if he fails to demonstrate either prong. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one . . . ."). "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 698.

With respect to counsel's performance, there is a "strong presumption" it was not deficient. *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Where "the record does not explicitly disclose trial counsel's actual strategy or lack thereof (either due to lack of diligence on

the part of the petitioner or due to the unavailability of counsel), the presumption may only be rebutted through a showing that no sound strategy . . . could have supported the conduct." *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005).

To establish prejudice, Johnson must show "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. He must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). The Court must consider the totality of the evidence. *Strickland*, 466 U.S. at 695. Counsel cannot be found to be ineffective for failing to pursue a meritless claim. *See United States v. Bui*, 795 F.3d 363, 366–67 (3d Cir. 2015) ("'[T]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.'") (quoting *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999)).

## III

### A

Johnson believes the R&R improperly found no *Strickland* prejudice with respect to the admission of Tyrone Edgefield's identification testimony. (Pet'r Obj., ECF 15 at 1-6.) During the trial, Edgefield identified Johnson as the driver of the car from which shots were fired. (N.T. 11/9/2011 at 94.) Edgefield said he "didn't really give [the police] full detail" about who he saw in the car on the night of the shooting because he "had to live in the neighborhood" and thought "what if these guys come after me . . . ."

(*Id.* at 99; *see also id.* at 122-23.)  He described the car where the shooter had been a passenger as a silver Honda or an Acura that he had not seen before.[1]  (*Id.* at 92.)  He said he was "in shock" and could only say then that he had seen "just some fat boy, like some light-skinned fat boy."  (*Id.* at 99, 120.)

When Edgefield was questioned weeks after Perkins was shot, he told investigators "he couldn't see nothing" that night because he "was afraid for [his] life." (*Id.* at 105.)  He testified he recognized someone in a photo array he was shown at the time but did not tell the police.  (*Id.* at 105-06.)  Ultimately, Edgefield did not identify Johnson as the driver until six months after the shooting when he went back to the police because he "couldn't live with that burden."  (*Id.* at 108-09.)  He identified Johnson in a photo array on March 3, 2009 (*id.* at 112) and pointed him out in a police lineup on August 26, 2009.  (*Id.* at 114-15.)

At trial, Edgefield testified he did not know the names of the driver or passenger at the time of the shooting.  (*Id.* at 100, 141.)  Asked how he had learned Johnson's name, Edgefield answered, "[t]he street, you know the streets talk . . . ."  (*Id.* at 100.) Counsel for a co-defendant objected to the testimony and was overruled.  (*Id.*) Johnson's counsel did not separately object.  (*Id.*)  The trial judge explained the statement would not be admitted for its truth, but only "to show where he learned the names from."  (*Id.*)  She told Edgefield, "don't tell us what people told you, but tell us how did you learn the names."  (*Id.*)  Edgefield explained,

> I'm not sure what the[ir] names were.  Its just that I knew the[ir] faces.  I couldn't put a name to them.  The[ir] name could be anything at that time.

---

[1]    According to another witness, Johnson had been driving a black Chevrolet Monte Carlo through the neighborhood on days prior to the shooting – when he allegedly had been looking for Perkins.  (N.T. 11/9/2011 at 59-63.)

I didn't know.  But when I heard the names, it was like, Okay, its that.  But I don't know if it's that's the same names that add up to these faces.

(*Id.* at 101.)

On direct appeal, the Superior Court determined Johnson was not entitled to relief on his claim that the trial court improperly admitted Edgefield's testimony about what he heard from "the street."  *See Johnson*, 2013 WL 11274675, at *3-4.  It held Johnson waived any challenge to the testimony by failing to object at trial.  *Id.* at *3. Alternatively, even though Edgefield's statement presented a "very real hearsay problem . . . ," *id.* at *3 n.3, the Superior Court held its admission was harmless because Edgefield "had ample opportunity to view" the vehicle's occupants and his identification was based on "personal observations" sufficient to refute any claim it was "based solely on rumors circulating within the neighborhood."  *Id.* at *4.

Johnson now argues the admission of Edgefield's statement violated his rights under the Confrontation Clause and denied him counsel's effective assistance.  (Pet'n, ECF 1 at 1, 7-10.)  He contends his counsel's failure to raise "a proper objection . . . presented compelling grounds for a post-conviction" ineffectiveness claim because the Superior Court determined the testimony was hearsay.  (*Id.* at 7.)  His Amended PCRA Petition did not assert a Confrontation Clause claim based on Edgefield's statement (Resp't Br., Ex. B., ECF 18-1 at ECF p. 15-33) and he concedes his PCRA counsel did not claim his trial counsel was ineffective for failing to object to it.  (Pet'n, ECF 1 at 7.) Instead, he contends *Martinez v. Ryan*, 566 U.S. 1 (2012) excuses PCRA counsel's failure to make the appropriate Sixth Amendment claim.  (*Id.* at 7-8.)

Even if PCRA counsel's failure to preserve the issue resulted in the procedural default of a *Strickland* claim that had "some merit," *see Workman*, 915 F.3d at 937, his

10

claim based on the testimony about "the street" fails because a merits examination of the underlying *Strickland* claim shows Johnson's trial counsel was not ineffective.[2] Regardless of whether Edgefield's statement about how he learned Johnson's name violated the Confrontation Clause, Johnson has not shown prejudice – i.e., he has not established a reasonable probability his trial's outcome would have been different if his trial counsel had objected and the jury had not heard Edgefield say how he learned Johnson's name.[3]  What mattered for purposes of Johnson's conviction was not that Edgefield knew his name, but that Edgefield recognized him – regardless of his name – as the driver of the car from which the shots that killed Perkins were fired.  The evidence at trial supported Edgefield's identification of Johnson absent any testimony about what Edgefield heard from "the street."

According to Johnson, the Commonwealth's identification evidence was "weak" and "improperly bolstered by" Edgefield's statement because it permitted "the jury to infer that persons in the community had stated that [Johnson] was one of the persons involved in the shooting."  (Pet'r Reply to Resp. to Obj., ECF 21 at 9-10.)  He contends the R&R understated the testimony's significance, ignored undisputed facts regarding Edgefield's ability to identify him and ultimately erred in finding no *Strickland* prejudice from trial counsel's failure to object to Edgefield's reference to "the street." (*Id.* at 3.)  But when Edgefield's statement is considered in the context of all the

---

[2]    The habeas statute gives the Court discretion to deny a claim on its merits even though it may be unexhausted and procedurally defaulted.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[3]    When analyzing a *Strickland* claim, the Court may address the prejudice prong first, "'[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" *United States v. Travillion*, 759 F.3d 281, 289 (3d Cir. 2014) (*quoting Strickland*, 466 U.S. at 697).

evidence at trial, Johnson's interpretation of the effect of Edgefield's testimony is not enough to warrant habeas relief.

As the Superior Court explained in its opinion on Johnson's appeal, "Edgefield's eyewitness observations on the night of Perkins' killing were a far greater factor in producing a guilty verdict against [Johnson] than Edgefield's inadmissible, but ancillary, testimony regarding how he learned the names of [Johnson] and his co-defendant." *Johnson*, 2013 WL 11274675, at *4. Edgefield testified the car stopped in front of where he and Perkins sat and he saw the driver – the person he identified in court as Johnson – when Johnson "downed the window" and "looked like [he] wanted to be seen. He looked, then backed up." (N.T. 11/9/2011 at 94.) The car's driver's side was closest to Edgefield and he made eye contact with the driver. (*Id.*) Edgefield said: "[h]e looked. I'm still looking, like who is this guy, who is he. As I'm looking at him, it's like he wanted to see who it was, me and [Perkins], wanted us to see who he was." (*Id.* at 95.) He testified Johnson "was right there, like 8 to 10 feet in front of me. It's like I see who you is. They wanted to be seen, like I said." (*Id.* at 96.)

When Johnson's lawyer cross-examined Edgefield, he sought to cast doubt on Edgefield's testimony that his identification of Johnson was based on his first-hand observation, saying, "[s]o whatever you later learned, you learned from somebody else, correct, people talk, like you said, people are talking?" (N.T. 11/9/2011 at 135.) But Edgefield responded "they can say names all they want. It's not the point. I know who was in the car that night." (*Id.*) When counsel asked if "the names of who might have been involved" were something Edgefield "heard from the neighborhood," Edgefield responded, "regardless of the names. I know them two guys in the car. I don't know

what they names was. . . .  They couldn't tell me who was in the car.  Only I knew who was in the car." (*Id.* at 141.)  Questioned whether he was "able to put the names with the faces because of what [he] heard in the neighborhood," Edgefield responded, "[n]ot the names with the faces, but I knew the faces." (*Id.* at 142.)  Asked how, he explained, "[b]ecause I seen them in the car that night" and then testified that "[i]t only take a second to see somebody face" and then he could remember the face forever.  (*Id.*)

Although Edgefield did not tell the police he could identify Johnson until six months after the shooting, Johnson has not shown there is a reasonable probability that, but for the testimony about what Edgefield heard from the "street," he would have been unable to identify Johnson and the outcome of the trial would have been different. That Edgefield was impeached by his earlier statements does not change this conclusion.  He consistently explained his initial statements to the police were colored by his perception that he might suffer retribution if he identified Johnson or the shooter, testimony bolstered by Detective Thomas Gaul's description of Edgefield as "deathly afraid" of being seen with detectives.  (N.T. 11/10/2011 at 59-61.)  Johnson has not shown reasonable jurists would debate whether trial counsel was ineffective by failing to have the trial court exclude Edgefield's statement.

B

Johnson's second objection is that the R&R improperly concluded there was an appropriate objection to Detective Gaul's testimony, his trial counsel was not deficient for failing to seek a limiting instruction and there was no resulting *Strickland* prejudice.  Gaul testified he was was "shocked" when Edgefield came to the police administration building on March 3, 2009 and asked to see him.  (*Id.* at 71-72.)  Gaul

showed Edgefield a photo spread in September 2008.  At that point, Edgefield did not

identify anyone.  (*Id.* at 73.)  In 2009, he identified the shooter.  (*Id.*)  Gaul then showed

him, for the first time, another photo array.  (*Id.* at 73-74.)  Edgefield circled Johnson's

photo and identified him as the driver.  (*Id.* at 76-77.)  Gaul testified the second photo

array was compiled after September 2008 when, following "investigation, more

information was developed as far as . . . ."  (*Id.* at 74.)  Trial counsel objected[4] and the

prosecution restated its question, asking, "[d]id you have a second photo array

prepared?"  (*Id.* at 75.)  Gaul answered, "[y]es, sir, I did." (*Id.*).  After two more

questions, the trial judge said, "[f]or the record, the objection is overruled" and told

counsel to "[g]o on."  (*Id.*)  Then, when asked "[w]ho was the suspect or the prime in this

photo spread," Gaul responded, "[t]he prime suspect in this photo spread was . . .

Johnson."  (*Id.*)  Johnson's trial counsel did not object again.

On direct appeal, the Superior Court held Gaul's testimony was not hearsay

because when he referred to "investigation, more information," he did not specify the

information's source.  *Johnson*, 2013 WL 11274675, at *4.  Alternatively, it found the

testimony was "'an out-of-court statement offered to explain an officer's course of

conduct'" which was not excludable under the hearsay rule under Pennsylvania law.

*Id.* (quoting *Commonwealth v. Dargan*, 897 A.2d 496, 500 (Pa. Super. Ct. 2006))

(alterations omitted).

Johnson argues Gaul's "testimony presented hearsay/Confrontation Clause

issues as the jury could find that others . . . had asserted that [Johnson] was one of the

---

[4]     Johnson argues trial counsel should have made a specific objection to the testimony on
Confrontation Clause grounds (Pet'n, ECF 1, at 9), but he has not shown how the failure to reference
the Confrontation Clause rendered trial counsel's performance deficient under *Strickland*.

perpetrators." (Pet'r Obj., ECF 15 at 7.) He also contends he was entitled to a limiting instruction explaining Gaul's testimony had a non-hearsay purpose and that trial counsel's failure to request a limiting instruction left "the jury free to accept the statement for its truth and to believe . . . that someone with knowledge had informed law enforcement that [Johnson] was the shooter." (*Id.*; Pet'r. Reply to Resp. to Obj., ECF 21 at 4-5.) He argues the R&R wrongly assumes his "trial counsel had a strategic reason for not requesting a limiting instruction" where he had been "willing to risk calling attention" to the testimony by making an objection "in front of the jury." (Pet'r. Reply to Resp. to Obj., ECF 21 at 7.)

To the extent Johnson's claim about Gaul's testimony relies on the Confrontation Clause, he did not raise it in his PCRA petition and it is unexhausted. But here again, even if even if the failure to preserve the issue resulted in the procedural default of a *Strickland* claim that had "some merit," *see Workman*, 915 F.3d at 937, Johnson cannot proceed with his claim based on Gaul's testimony because he has not shown his trial counsel was ineffective under *Strickland*.

In Pennsylvania, "evidence which is admitted for a limited purpose must be accompanied by a limiting instruction to focus the jury's consideration of the evidence to its appropriate purpose." *Commonwealth of Pa. v. Coleman*, 230 A.3d 1042, 1048 (Pa. 2020). However, "[t]rial counsel is not constitutionally required to request a limiting instruction any time one could be given, because counsel might reasonably conclude that such an instruction might inadvertently call attention to the [adverse] evidence." *Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2006). Under *Strickland's* deferential standard, "ineffectiveness will not be found based on a tactical decision

which had a reasonable basis designed to serve the defendant's interests." *Werts*, 228 F.3d at 190.

Johnson argues any finding that his trial counsel had a strategic reason for not requesting a limiting instruction is speculation. (Pet'r Obj., ECF 15 at 7-8.) However, it is his burden to overcome the "strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). The Court cannot confirm whether or not trial counsel's failure to request a limiting instruction was a tactical decision. (*See* R&R, ECF 13 at 28 n.17 (noting trial counsel now suffers from Alzheimer's and would be unable to offer reliable testimony).) Because "the record does not explicitly disclose trial counsel's actual strategy or lack thereof," Johnson must show "no sound strategy" could have supported the choice to forego a request for a limiting instruction. *Harrington*, 562 U.S. at 104. He has not.

Moreover, the disputed testimony "did not figure prominently into the trial . . . ." *United States v. Stanley*, 405 F. App'x 662, 665 n.1 (3d Cir. 2010). Under *Strickland's* deferential standard, it is reasonable to conclude that trial counsel elected not to ask for a limiting instruction so as to not draw attention to Gaul's testimony that the second photo array had been prepared in response to "more information" about the "prime suspect." Indeed, after the statement, the detective provided no further detail about the additional "information" which caused the police to prepare the second photo lineup. Under the circumstances, Johnson has not shown trial counsel's performance with respect to Gaul's testimony provides a basis for habeas relief.

C

Johnson's third objection is to the R&R's determination that no relief is due in connection with the admission of testimony that his brother Jacobs: threatened Perkins and subsequently refused to speak to the police. Johnson argues the R&R "erroneously finds that Jacob[s'] actions were proper evidence of [Johnson's] motive" and maintains evidence Jacobs refused to talk to Detective Gaul on counsel's advice deprived him of a fair trial because, without limiting instructions, it could have been understood by the jury as evidence Jacobs "was trying to protect or cover-up for" Johnson. (Pet'r Obj., ECF 15 at 8-11.)

State court rulings on whether evidence is admissible rarely will serve as a ground for habeas relief. *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986). An evidentiary error made in state court is not "of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." *Bianca v. Attorney Gen. of New Jersey*, 623 F.2d 307, 312 (3d Cir. 1980). To obtain habeas relief, Johnson "must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Rosen v. Superintendent*, 972 F.3d 245, 252 (3d Cir. 2020) (citation and internal quotation omitted). "[S]tate courts need leeway to engage in their work, and federal courts should not hold routinely that this work violates due process." *Spanier v. Director Dauphin Cnty. Prob. Servs.*, 981 F.3d 213, 225 (3d Cir. 2020).

1

On direct appeal, Johnson argued the trial court erred in admitting testimony about Jacobs' threat to Perkins – i.e., "you better have your vest on" – because there

was "no link" between Perkins' murder and Jacobs' demeanor.[5]  *Johnson*, 2013 WL 11274675, at *4.  Citing a Pennsylvania Supreme Court decision holding "[e]vidence to prove motive is generally admissible," the Superior Court found a "sufficient link" to support the testimony's admission  because "[t]he evidence showed that Johnson and Jacobs were brothers and" Johnson searched for Perkins in the neighborhood after retrieving Jacobs' phone.  *Id.* (citing *Commonwealth v. Philistin*, 53 A.3d 1, 16 (Pa. 2012)).  Johnson contends the Superior Court's decision was "unreasonable as a matter of fact and law" because there was "no evidence" Johnson "caused, knew of, or acted because of [Jacobs'] alleged threat."  (Pet'n, ECF 1, at 10.)

According to Johnson, "establishing motive by reason of another's threats to a victim requires proof that the defendant 'knew' of the threats" and "any such linkage to show motive or [his] reasons for driving in the neighborhood before the shooting was purely speculative in nature."  (Pet'r Reply to Resp. to Obj., ECF 21 at 6.)  In support, he cites *Commonwealth v. Ragan*, 645 A.2d 811, 824 (Pa. 1994); *Commonwealth v. Thomas*, 215 A.2d 36, 51-52 (Pa. 2019); *United States v. Rowe*, 919 F.3d 752 (3d Cir. 2019); and *Commonwealth v. Washington*, 573 A.2d 1123, 1125 (Pa. Super. Ct. 1990).  (*See* Pet'r Obj., ECF 15 at 10; Pet'r. Reply to Resp. to Obj., ECF 21 at 6.)  The Commonwealth argues the cited decisions do not support Johnson's position (Resp. to

---

[5]     "A federal habeas court is limited to deciding whether the admission of . . . evidence rose to the level of a due process violation."  *Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001.)  Johnson raises this claim as a Due Process violation for the first time on habeas review.  "Errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."  *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).  "[T]o claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment," Johnson was required to "say so, not only in federal court, but in state court."  *Duncan v. Henry*, 513 U.S. 364, 366 (1995).  However, Johnson's claim plainly has no merit, and the Court "may bypass the exhaustion issue altogether should [it] decide that the petitioner's habeas claim fails on the merits."  *Roman v. DiGuglielmo*, 675 F.3d 204, 209 (3d Cir. 2012); *see also* 28 U.S.C. § 2254(b)(2).

Obj., ECF 18 at 15 n.10), an argument Johnson deems "baseless" because "the basic principle is so well established and the facts so clear in this case as to lack of linkage . . . ."  (Pet'r. Reply to Resp. to Obj., ECF 21 at 6, n.1.)

However, Johnson cites no clearly established Supreme Court precedent in support of his "linkage" argument and the decisions he does cite do not require direct proof that Johnson knew of Jacobs' threat to support its admission.  *See United States v. Rowe*, 919 F.3d 752, 559 (3d Cir. 2019) ("The Government may rely on direct and circumstantial evidence to make its case to the jury."); *Commonwealth v. Thomas*, 215 A.3d 36, 51-52 (Pa. 2019) (finding the trial court erred when it allowed the prosecution to introduce the petitioner's potential deportation if he was convicted of sex abuse as evidence of his motive to kill his victims in the absence of evidence he was aware deportation was a potential consequence of the abuse); *Commonwealth v. Ragan*, 645 A.2d 811, 824 (Pa. 1994) (holding the prosecution could question a witness about threats to his family in order to explain the witness's prior inconsistent statement); *Commonwealth v. Washington*, 573 A.2d 1123, 1125 (Pa. Super. Ct. 1990) (finding it was reversible error to admit evidence of a controlled buy where "there was virtually nothing to link" the defendant to the purchase).

Further, arguing a "lack of linkage" shortchanges the evidence.  There was evidentiary support for the trial court's conclusion that the testimony about Jacobs' threat was relevant to proving Johnson's motive – i.e., there was evidence to permit reasonable jurors to infer that Johnson acted to follow through on his brother's threat.  Darnell Williams told the police that Johnson "came around and he was all hot" after the fight between Jacobs and Perkins.  (N.T. 11/9/2011 at 59.)  Johnson asked Williams

"who jumped my brother" and "who took [Jacobs'] phone"?  (*Id.*)  Williams said he told Perkins to "watch his back because [Johnson] was coming around.  He was in that black Monte Carlo" and "the car was coming around the block the night [Perkins] was killed . . . like four hours before . . . " the shooting.  (*Id.* at 61.)  At trial, Williams denied the veracity of his prior statement to the police but acknowledged he had initialed it as his own (*id.* at 59-61) and the trial judge granted the prosecutor's request to treat Williams as a hostile witness.  (*Id.* at 64-65.)

The trial court acted within its discretion by ruling the testimony about Jacobs' threat to Perkins was admissible and Johnson has not shown its determination was an unreasonable application of fact or clearly established Federal law requiring habeas relief on due process grounds.

2

Johnson asserts he was denied his Fifth and Sixth Amendment rights to a fair trial when the trial court, over an objection, allowed the prosecution to present Gaul's testimony that he wanted to obtain a statement from Johnson's brother but was "unsuccessful" because Jacobs' attorney said Jacobs "wasn't going to give an interview and he wasn't going to be made available."  (Pet'n, ECF 1, at 12-13 (quoting N.T. 11/10/2011 at 69).)  Johnson argues the testimony "create[d] the inference for lay jurors that the person who sought counsel [(i.e., Jacobs)] is either guilty of some crime or is covering for someone else."  (*Id.* at 13.)  The Superior Court rejected this claim on direct appeal, finding the trial court did not abuse its discretion in admitting the testimony as it was relevant to Johnson's motive where the Commonwealth's trial theory was that he participated in Perkins' murder because Perkins took his brother's cellphone and broke

20

up the fight between Jacobs and Edwards. *Johnson*, 2013 WL 11274675, at \*5.

The disputed testimony comes from the prosecution's questions to Gaul about his efforts to find and meet with individuals relevant to his investigation. (N.T. 11/10/2011 at 67-70.) When asked if he had spoken with Jacobs, trial counsel objected and, at sidebar, argued Jacobs' silence on the advice of counsel was not admissible. (*Id.* at 68.) The prosecution responded that Jacobs was "not a defendant" and that it was appropriate to ask Gaul "about the completeness of [his] investigation and reasons why he was not able to follow up." (*Id.*) Gaul then testified he visited Jacobs' home twice but was not permitted to speak with him and, later, an attorney contacted Gaul to say Jacobs would not be made available for the investigation. (*Id.* at 69.) The prosecution then questioned Gaul about the rest of his investigation. (*Id.* at 69-109.)

Johnson cites no relevant Supreme Court precedent in support of his argument that a due process violation arises from the introduction of evidence that a non-defendant invoked his right to remain silent. Instead, he cites cases which – he concedes – involve "suspects who ultimately became the charged defendants" and argues "the principle must apply as well to those who are associated by the prosecution to the defendant." (Pet'n, ECF 1 at 13.) Johnson argues "evidence of one person's constitutionally protected right to remain silent cannot be used to create an inference of his complicity in a criminal act." (*Id.*) However, *Commonwealth v. Molina* addresses the ability to introduce evidence of a *defendant's* "pre-arrest silence as substantive evidence of guilt," holding the defendant's refusal to speak with a detective was "an invocation of his right against self-incrimination . . . ." 14 A.3d 430, 479-80 (Pa. 2014); *see also Commonwealth v. Adams*, 104 A.3d 511, 517-18 (Pa. 2014) (holding a

detective's testimony that *the defendant* refused to speak did not unconstitutionally burden the defendant's right against self-incrimination "because the reference was contextual and brief and did not highlight [the d]efendant's silence as evidence of guilt"); *United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3d Cir. 1972) ("the relevant question is whether the particular defendant has been harmed by the state's use of the fact that he engaged in constitutionally protected conduct") (emphasis omitted). Johnson's silence is not the issue and Jacobs was not a defendant.  Johnson has not shown it is "well understood and comprehended in existing law beyond any possibility for fairminded disagreement" that the introduction of a non-defendant's silence violated his right to due process.  *Metrish*, 569 U.S. at 357-58.

Nor has Johnson shown the state court's failure to bar Gaul's testimony was an unreasonable determination of the facts considering the evidence presented at trial.  He argues Jacobs' refusal to speak with the police is "irrelevant to the issue of what [Johnson] did or did not do, or with any respect to any motive."  (Pet'r Obj., ECF 15 at 11.)  Not so.  Gaul's testimony addressed the thoroughness of his investigation into Perkins' murder after he learned about the victim's conflict with Jacobs.  It was not unreasonable for the state court to conclude the argument and Jacobs' subsequent unwillingness to discuss it with the police were relevant to Johnson's motive to participate in Perkins' murder.

### D

Johnson's fourth objection is to the R&R's determination that no relief is due for his trial counsel's failure to interview and present the testimony of an alibi witness – Veronica Thomas (his aunt) – when she would have "placed [him] at a location different

22

from that of the shooting." (Pet'n., ECF 1 at 13.) He argues he could not have knowingly and voluntarily waived calling Thomas as a witness when his trial counsel did not investigate her. (Pet'r. Obj., ECF 15 at 13.)

Johnson raised this claim in his PCRA proceeding and the court determined he was not prejudiced by the absence of Thomas' testimony because the evidence against him "was overwhelming, there was substantive eyewitness and motive testimony, and the alleged alibi testimony would not have changed the outcome." (Resp't Br., Ex. C., ECF 18-1 at ECF p. 39). In addition, the PCRA court found Johnson could not argue he had not knowingly and intelligently waived Thomas' testimony because he told the court there were no witnesses he wished to call. (*Id*.) On appellate review, the Superior Court upheld the PCRA court's determination. *Johnson*, 2018 WL 6629183, at *1.

The trial judge asked Johnson if he understood his "absolute right to testify on [his] own behalf and to call any witnesses that [he] desire[d] on [his] own behalf . . . ." (N.T. 11/14/2011 at 12.) He responded that he did. (*Id*.) When asked if he had discussed this with his trial counsel and decided he did not want his attorney to present any witnesses on his behalf, he answered yes. (*Id*. at 13.) Asked if he had made his decision while considering "all the things in favor of, and all the things against calling witnesses . . . ." he said he had. (*Id*. at 14.) Asked if he had been satisfied with his trial counsel's services, he said yes and agreed he had made the decision to waive the testimony of any witness on his behalf of his own free will. (*Id* at 15-16.)

Because the state court already rejected Johnson's alibi witness claim, it is subject to "doubly" deferential review here, so as "to afford both the state court and the

defense attorney the benefit of the doubt." *Woods v. Donald*, 575 U.S. 312, 316 (2015)

(citation and internal quotation omitted).  Johnson points to no authority the state

court might have unreasonably applied in upholding his waiver of Thomas's testimony

during the colloquy.  Although he cites *Commonwealth v. Perry*, 644 A.2d 705, 709 (Pa.

1994) for the proposition that a trial counsel's "failure to interview witnesses [is]

ineffective, arguably per se" (Pet'r Reply Mem., ECF 12 at 7), he does not argue his trial

counsel failed to interview *any* witnesses.  Instead he contends only that his trial

counsel did not interview Thomas.  He does not refer to any clearly established federal

law that required his attorney to investigate Thomas in order to validate his waiver of

her testimony during the colloquy.  *Cf. Graves v. Wenerowicz*, No. 10-1563, 2014 WL

2587044, at *6 (E.D. Pa. June 9, 2014) (denying habeas relief where the petitioner had

"not cited any U.S. Supreme Court precedent holding that an attorney could render

ineffective assistance by omitting evidence that his client agreed to omit").

    "A particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to

counsel's judgments.'" *Wiggins v. Smith*, 539 U.S. 510, 521-522 (2003).  "[A]libi

testimony by a defendant's family member[ ] is of significantly less exculpatory value

than the testimony of an objective witness." *Romero v. Tansy*, 46 F.3d 1024, 1030 (10th

Cir.1995), cited by *McGahee v. United States*, 570 F. Supp. 2d 723, 736 (E.D. Pa. 2008),

aff'd 370 F. App'x 274 (3d Cir. 2010).  In addition, Johnson does not say Thomas would

have testified that she "actually saw" him somewhere other than where (and when)

Perkins was shot.  *See Caballero v. Folino*, No. 04-2190, 2008 WL 650024, at *7 (E.D.

Pa. Mar. 10, 2008) (finding exclusion of alibi testimony from the defendant's mother

and brother did not deprive him of a fair trial where "neither witness testified that he or she actually saw Petitioner in the home at the time of the robbery").  Considering the state court record, Thomas' purported testimony and Johnson's waiver of that testimony, he has not shown the state court made an unreasonable determination of the facts when it found he was not prejudiced by the fact that Thomas was not called as a witness.  *Cf.*, *Frazier v. Secretary Pa. Dep't of Corr.*, 663 F. App'x 211, 215 (3d Cir. 2016) (finding colloquy supported the conclusion that not calling a witness "was a reasonable course of action"); *Guzman v. Rozum*, No. CV 13-7083, 2017 WL 1344391, at *15 (E.D. Pa. Apr. 12, 2017) (denying habeas relief where the PCRA court did not make "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding" when the trial court record unequivocally established the petitioner's voluntary election "not to call alibi witnesses to testify on his behalf").

E

Johnson's fifth objection is to the R&R's recommendation that there is no basis for a cumulative error prejudice analysis.[6]  Individual errors that "do not warrant habeas relief may do so when combined." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Marshall v. Hendricks*, 307 F.3d 36, 94) (3d Cir. 2002)). "[A] cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to

---

[6]      Respondents argue this claim is defaulted because Johnson did not exhaust it in state court (Resp. to Obj., ECF 18 at 21), but the Court exercises its discretion under the habeas statute to consider and deny it on its merits.  28 U.S.C. § 2254(b)(2).

be harmless." *Id.* (citation and internal quotation omitted).  Cumulative errors warrant habeas relief if the petitioner has established that the errors "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  In other words, Johnson must establish "'actual prejudice.'" *Id.* (quoting *Brecht*, 507 U.S. at 637).  But, "[t]he cumulative effect of a series of non-errors . . . is nothing." *Bueno v. Overmyer*, Civ. A. No. 16-4468, 2019 WL 5686185, at *16 (E.D. Pa. Aug. 26, 2019), report and recommendation adopted, 2019 WL 5687778 (E.D. Pa. Oct. 31, 2019).

Because Johnson has not established any "errors that individually have been found to be harmless," there are none that can be aggregated or analyzed for cumulative effect.

F

Johnson's sixth and final objection to the R&R concerns its failure to recommend the grant of a certificate of appealability on any of his claims.  A certificate of appealability should only be issued if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Because Johnson's habeas petition is without merit, he has not made the required showing. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (explaining the requirements for obtaining a certificate of appealability under section 2253(c)(2)).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.